UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-60450-CIV-COHN/SELTZER/PALERMO

UNITED STATES COMMODITY
FUTURES TRADING COMMISSION,

       Plaintiff,

v.

ANGUS JACKSON, INC.,
MARTIN HAROLD BEDICK,
and MARTIN B. ROSENTHAL,

       Defendants.

_____/

## <u>ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

**THIS CAUSE** is before the Court upon Plaintiff's Motion for Summary Judgment

Against Defendants Angus Jackson, Inc., and Martin Harold Bedick [DE 47] ("Motion").

The Court has carefully reviewed the Motion, the briefs supporting and opposing the

Motion, and the parties' factual statements and record submissions, and the Court is

otherwise fully advised in the premises.[1]

---

[1] Defendants Angus Jackson, Inc., and Martin Harold Bedick were previously represented by counsel. After these Defendants discharged their attorneys, however, the Court granted defense counsel's motion to withdraw. <u>See</u> DE 43. Bedick later notified the Court that he would proceed *pro se*, and he has responded to Plaintiff's Motion and Statement of Material Facts. <u>See</u> DE 46, 51-53. Although the Court repeatedly cautioned Angus Jackson, Inc., that it must be represented by counsel in order to defend this case, no new counsel has appeared on the company's behalf. <u>See</u> DE 43 at 2-3 ("Defendant Angus Jackson, Inc., shall have substitute counsel file a notice of appearance in this case on its behalf. Failure to have such a notice of appearance filed will prevent Defendant Angus Jackson, Inc., from defending this case and may ultimately result in a default being entered against the corporate Defendant."). For this reason, Angus Jackson, Inc., has not responded to Plaintiff's Motion. <u>See</u> DE 50 at 2 ("[T]he Court again emphasizes that Defendant Angus Jackson, Inc., may appear in this case only through counsel. Therefore, unless substitute counsel appears on behalf of Defendant Angus Jackson, Inc., it may not respond to . . . Plaintiff's Motion for Summary Judgment and risks having summary judgment entered against it by default." (citations omitted)); DE 55 at 1 n.1 ("Defendant Angus Jackson, Inc., has not filed any response to the Motion, as no substitute counsel has appeared on its behalf.").

I.      **Background**

    A.      **Material Facts**

        1.      **The Parties**

Plaintiff United States Commodity Futures Trading Commission ("Commission") is an independent federal regulatory agency charged with administering and enforcing the Commodity Exchange Act ("Act") and its regulations.  See DE 1 at 4, ¶ 9; DE 10 at 3-4, ¶ 9.  The National Futures Association ("NFA") is a futures association registered with the Commission pursuant to Section 17 of the Act, 7 U.S.C. § 21.  The NFA is a private corporation that serves as a self-regulatory organization for the futures industry. Its members include futures commission merchants ("FCMs"), commodity pool operators, commodity trading advisors, introducing brokers ("IBs"), and other futures professionals registered with the Commission.  The NFA is responsible, under Commission oversight, for certain aspects of the regulation of these futures entities and their associated persons.  Among other things, the NFA focuses on the qualifications and proficiency, financial condition, retail sales practices, and business conduct of its members.  See DE 47-1 at 2, ¶ 4 (Pl.'s Statement of Undisputed Material Facts); DE 52 at 1, ¶ 4 (Def. Bedick's Resp. to Pl.'s Statement of Material Facts).  "Membership in the NFA is mandatory for all entities conducting business on U.S. futures exchanges." Commodity Futures Trading Comm'n v. Levy, 541 F.3d 1102, 1104 n.4 (11th Cir. 2008).

Defendant Angus Jackson, Inc., ("Angus Jackson") was a Florida corporation involved in the trading of commodity futures and related investments.  Angus Jackson (including its predecessor company) has been registered as an IB and a member of the NFA since January 14, 1992, and as a notice broker since October 24, 2002.  Among

other activities as an IB, Angus Jackson introduced customer accounts to FCMs.[2]

Angus Jackson received fees and commissions for its services.  See DE 47-1 at 2, ¶ 3;

DE 52 at 1, ¶ 3.

Defendant Martin Harold Bedick began working for Angus Jackson's

predecessor company in 1992, until the spring or summer of 1993, when the company

was planning to close its office.  At that time, Bedick and Michael Rose decided to "pick

up the pieces" and start a new firm, which they named Angus Jackson, Inc., of Florida.

See DE 47-1 at 2, ¶ 5; DE 52 at 1, ¶ 5.  That entity is the corporate Defendant in this

action.  See DE 47-1 at 2, ¶ 3; DE 52 at 1, ¶ 3.

Bedick was the founder, principal, majority owner, chief financial officer, and vice

president of Angus Jackson.  Bedick did not report to anyone.  Rose was the president

of Angus Jackson in name only.  Rose and Bedick were the only two owners and

officers of Angus Jackson.  During the relevant time period, Bedick owned seventy-five

percent of the company, and Rose owned twenty-five percent.  See DE 47-1 at 2-3,

¶¶ 6-7; DE 52 at 1, ¶¶ 6-7.

Bedick solicited members of the general public to invest through Angus Jackson.

He managed the company's day-to-day operations including, but not limited to, hiring

traders, corresponding with clients, and authorizing payments from the firm's bank

accounts.  Bedick was solely responsible for setting the salaries and commission rates

of Angus Jackson employees and for hiring and firing employees.  Bedick was also a

---

[2]  Generally, an IB "is engaged in soliciting or in accepting orders for" commodity
futures and similar investments but "does not accept any money, securities, or property"
in connection with those transactions.  7 U.S.C. § 1a(31)(A); 17 C.F.R. § 1.3(mm);
17 C.F.R. § 1.57.  An FCM likewise solicits and accepts such orders but also accepts
funds or other property for the transactions.  See 7 U.S.C. § 1a(28); 17 C.F.R. § 1.3(p).

compliance officer for Angus Jackson.  Bedick admits that he was a controlling person of Angus Jackson.  See DE 47-1 at 3, ¶ 8; DE 52 at 1, ¶ 8; DE 10 at 11, ¶ 37.

In addition to his other roles with the firm, at all relevant times, Bedick was registered with the NFA as an associated person of Angus Jackson.  As discussed further below, Bedick was the only individual at Angus Jackson who agreed to pay commissions to Martin Rosenthal and the only employee who made false statements to the NFA.  Although Bedick denies some of the Commission's allegations in this case, he does not dispute that the conduct described in the Complaint was within the course and scope of his employment at Angus Jackson.  See DE 47-1 at 3, ¶¶ 10-11; DE 52 at 2, ¶¶ 10-11; DE 10 at 2, ¶ 3.

Bedick decided to cease the operations of Angus Jackson in January 2012.  According to Bedick, he made this decision as a result of the NFA's suspension of the company's membership, discussed below.  See DE 47-1 at 3, ¶ 9; DE 52 at 2, ¶ 9.

### 2.    Business Relationship with Martin Rosenthal

Martin Rosenthal became a client of Angus Jackson in the mid-to-late 1990s.  Previously, on September 12, 1988, a Commission Administrative Law Judge ("ALJ") had found Rosenthal—then a principal of another commodity-trading firm—liable for misrepresentation and fraud in violation of Section 4o(1) of the Act, 7 U.S.C. § 6o(1).  The ALJ ordered Rosenthal and his firm to pay a reparation award of $13,026.14, plus interest ("Commission Order").  This ruling became the final decision and order of the Commission on October 17, 1988.  To date, Rosenthal has not paid the reparation award and thus is in violation of the Commission Order.  Pursuant to Section 14(f) of the Act, 7 U.S.C. § 18(f), on or about October 30, 1988, Rosenthal became prohibited from trading on all registered entities due to his failure to comply with the Commission

Order.  See DE 47-1 at 3-4, ¶¶ 12-14; DE 52 at 2-3, ¶¶ 12-14; DE 47-3 at 20-29.[3]

In 2001, Marlene Weisman, who lived with Rosenthal, opened a trading account with Angus Jackson and gave Rosenthal power of attorney to trade on her account. Over the next several years, Rosenthal traded a total of four accounts for Weisman.[4] In 2004, Eugene Winterman, a friend of Weisman, opened a trust account with Angus Jackson, and Rosenthal traded that account through a power of attorney.  Beginning in 2008, Rosenthal also managed two accounts for his friends, as well as an account for Bedick.  In addition, Rosenthal traded an account for his son.  See DE 47-1 at 4, ¶ 15; DE 52 at 3, ¶ 15; DE 47-2 at 26, 31-32, 34; DE 47-3 at 9.

In January 2002, Bedick and Rosenthal discussed compensating Rosenthal for some of his trading through Angus Jackson.  When Rosenthal asked to be paid part of the commissions on the Weisman accounts, Bedick told Rosenthal, "great; get registered and I will be happy to pay you."  Rosenthal responded that he had an issue in his past and that he could not be registered.  Despite Rosenthal's disclosure of this problem, Bedick did nothing to determine what Rosenthal had done to prevent his registration with the Commission.  In fact, even though Bedick spoke to the NFA "several times in the course of a year" to ask questions about various matters, during the time pertinent to this case, Bedick never inquired about Rosenthal's registration status or whether he qualified for any exemptions from registration.  Instead, Bedick testified that he "covered . . . up" commission payments to Rosenthal:

---

[3]  A "registered entity" is a board of trade or other facility for trading futures contracts and related instruments.  See 7 U.S.C. § 1a(40); 17 C.F.R. § 1.3(nnnn).

[4]  Bedick notes that Weisman actually had one personal account and one IRA account and that a subaccount existed for each of her accounts.  See DE 52 at 3, ¶ 15.

> I told Mr. Rosenthal that because I believed I could not pay
> someone that was not registered that at some point I was
> going to be audited and they are going to ask me what this
> payment is for, so I said to him, send me an invoice so I
> don't have a problem, because I don't want any problems.
>
> So that was my biggest mistake, that I planned to lie to
> a regulator.

See DE 47-1 at 4-5, ¶¶ 16-17; DE 52 at 3, ¶¶ 16-17.

In January 2002, Angus Jackson began to pay Rosenthal directly for the commissions generated from certain client accounts he traded.  Rosenthal received commissions of forty percent for his trading in the Weisman and Winterman accounts. Rosenthal was not paid commissions for the other accounts he managed.  As noted above, Bedick was the only person at Angus Jackson involved in the decision to pay Rosenthal commissions.  See DE 47-1 at 5, ¶¶ 18-20; DE 52 at 3-4, ¶¶ 18-20.

Angus Jackson later paid commissions to Rosenthal through his companies, Rosenthal Research and Jarma Trading Inc. ("Jarma").  In a December 15, 2004, e-mail message to Rosenthal, Bedick stated that he could not get away with paying someone who was not registered the amount Bedick was sending to Rosenthal, and that they needed to come up with another idea for how to pay Rosenthal.  Around this time, Bedick knew he was going to be audited by the NFA and that the NFA was going to ask Bedick about a payment he was making to Rosenthal.  See DE 47-1 at 5-6, ¶¶ 21-22; DE 52 at 4, ¶¶ 21-22.

Bedick asked Rosenthal to create fake invoices for payments to Rosenthal, which Bedick would provide to the NFA to conceal the purpose of the payments. Bedick told Rosenthal, "for example, if the invoice is for $5,000, instead of saying commissions say trading system or trading advisory, something along the line that would reflect that I bought something from you."  Rosenthal created and submitted

invoices for Jarma showing charges for computer services, with entries such as "Cost for programming" and "Development and training meetings."  These invoices were actually for Rosenthal's commissions.  Angus Jackson paid the fake Jarma invoices to hide the commission payments from the NFA.  <u>See</u> DE 47-1 at 6, ¶¶ 23-25; DE 52 at 4, ¶¶ 23-25.

From January 2002 to December 2008, Rosenthal's trading for the Weisman and Winterman accounts generated commissions totaling $1,553,149.75.  Of these commissions, Angus Jackson received approximately $955,000, and Rosenthal received at least $598,025.65.  Bedick represented to the NFA that Rosenthal received about "600k" in commissions from Angus Jackson.  <u>See</u> DE 47-1 at 10, ¶¶ 40-42; DE 52 at 6, ¶¶ 40-42; DE 47-3 at 10, ¶ 7.[5]

### 3.   NFA Audits and Sanctions

In furtherance of its official duties under the Act, the NFA conducted a routine audit of Angus Jackson in 2005.  The NFA asked Bedick about a $25,000 payment from Angus Jackson to Jarma, since the NFA had no record of what Jarma was. Bedick told the NFA that Jarma was owned and operated by Rosenthal and that the payment was for software development and a meeting to discuss Rosenthal's system. These statements were not true.  During his deposition in this case, Bedick testified that he made these false statements because he believed that he was not allowed to pay

---

[5] In his Response to the Commission's Statement of Material Facts, Bedick notes that MF Global, Angus Jackson's clearing firm, received about twenty percent of the total commissions generated by Rosenthal's trading.  <u>See</u> DE 52 at 6, ¶ 43.  But as the Commission points out, the amounts paid to the clearing firm represent an overhead cost to Angus Jackson.  <u>See</u> DE 62 at 7-8.  This cost does not change the fact that, under the arrangement with Rosenthal, Angus Jackson was entitled to sixty percent of Rosenthal's trading commissions.  <u>See</u> DE 47-3 at 2, 16-17.

Rosenthal commissions, so Bedick "covered that payment up."  <u>See</u> DE 47-1 at 6-7, ¶ 26; DE 52 at 4, ¶¶ 26.

In 2008, the NFA conducted another routine audit of Angus Jackson.  During that audit, Bedick made false statements to the NFA regarding payments of $13,000 and $17,000 from Angus Jackson to Jarma.  Bedick told the NFA that the payments were for services pertaining to the development of new software, trading systems, and options programs, and that Jarma was a software developer.  These statements were false.  During his deposition, Bedick again testified that he "covered up" the payments to Jarma.  <u>See</u> DE 47-1 at 7, ¶ 27; DE 52 at 4, ¶ 27.

In the spring of 2010, Weisman brought a mediation proceeding against Angus Jackson because of trading losses that she had suffered in 2008.  Bedick's payments to Rosenthal came up during the mediation proceeding.  According to Bedick, his cover-up of those payments "was going to present a problem," and therefore Angus Jackson settled the case.  In the settlement agreement, Angus Jackson and Bedick agreed to pay Weisman $315,000; Bedick claims that this figure represented the total amount of commissions earned on Weisman's accounts.  <u>See</u> DE 47-1 at 7, ¶ 29; DE 52 at 4-5, ¶ 29; DE 47-2 at 50-51, 95-96; DE 47-3 at 3, 5.

In August 2010, the NFA conducted a third audit of Angus Jackson as a result of the Weisman mediation and because Rosenthal had contacted the NFA and disclosed that Angus Jackson had paid him commissions.  Between the Weisman mediation and the 2010 audit, Bedick did not inform the NFA that he had previously made false statements during the 2005 and 2008 audits.  <u>See</u> DE 47-1 at 7-8, ¶¶ 30-31; DE 52 at 5, ¶¶ 30-31.  During the 2010 audit, the NFA asked Bedick about accounts that Rosenthal managed, how Rosenthal was compensated, and how Rosenthal was paid

commissions.  See DE 47-1 at 8, ¶ 32; DE 52 at 5, ¶ 32.  The Commission claims that, in response to these questions, Bedick began to repeat his prior false statements about the payments to Jarma.  When pressed for more details, however, Bedick admitted that the payments were for commissions earned by Rosenthal.  See DE 47-1 at 8, ¶ 32.  By contrast, Bedick denies making any false statements to the NFA during the 2010 audit.  See DE 52 at 5, ¶ 32.  Bedick asserts that during the Weisman mediation proceeding, he had already admitted the truth about the payments to Rosenthal.  See DE 47-2 at 49.

        As part of its 2010 audit, the NFA also sent Bedick and Rose an e-mail message with questions about the payments to Rosenthal; Bedick responded to the questions the same day.  Bedick's responses document that he had made false statements to the NFA during its prior audits of Angus Jackson.  For example, the NFA's e-mail asked why Rosenthal was not registered with the Commission or a member of the NFA, to which Bedick responded, "I did not know the specific reasons he was unable to get licensed."  The NFA also asked Bedick to describe the services provided by Jarma, to which Bedick replied, "There were no services."  See DE 47-1 at 8-9, ¶ 33; DE 52 at 5, ¶ 33.

        On October 21, 2010, the NFA sent a letter to Bedick summarizing the NFA's key findings in the 2010 audit.  One of those findings was that Angus Jackson had willfully submitted false and misleading information to the NFA and its agents— specifically, that the company had misrepresented during the 2005 and 2008 audits that payments to Rosenthal and Jarma were for software and option trading systems.  Bedick responded to the NFA's letter, on behalf of Angus Jackson, in a letter dated November 2, 2010.  In that letter, Bedick admitted that he "used extremely poor

judgment in deciding to pay Rosenthal and mislead the NFA with false information about those payments."  See DE 47-1 at 9, ¶¶ 34-35; DE 52 at 5, ¶¶ 34-35.

After the 2010 audit, the NFA determined that the false statements made by Bedick were material and in violation of NFA Compliance Rules 2-2(f) and 2-4.  In deciding whether a statement is material, the NFA makes an objective assessment based on the information available.  Rule 2-2(f) states that no NFA member or associate shall willfully submit materially false or misleading information to the NFA or its agents.  Rule 2-4 provides, in relevant part, that NFA members shall observe high standards of commercial honor and just and equitable principles of trade while conducting their commodity futures business.  See DE 47-1 at 9, ¶¶ 36-37; DE 52 at 5, ¶¶ 36-37.  The NFA also concluded that Bedick's misrepresentations violated NFA Bylaws 1101 and 301(b), which prohibit dealing with unregistered persons.

The NFA's Business Conduct Committee filed a complaint against Angus Jackson, Bedick, and Rose, alleging violations of NFA Rules 2-2(f) and 2-4, as well as other provisions.  On October 18, 2011, a Hearing Panel issued a decision finding that Bedick and Angus Jackson had violated these Rules, suspending Bedick and Angus Jackson from NFA membership for seven years, and permanently barring Bedick from acting as a principal of an NFA member.  Bedick and Angus Jackson appealed that decision; the NFA appealed the penalties imposed, seeking a permanent membership suspension.  On August 15, 2012, the NFA's Appeals Committee affirmed the Hearing Panel's findings of violations and sanctions.  See DE 47-1 at 9-10, ¶¶ 38-39; DE 52 at 5-6, ¶¶ 38-39; DE 47-4 at 2-27; DE 47-5 at 27-46.

B.      **Procedural History**

On March 12, 2012, the Commission filed this action against Angus Jackson,

Bedick, and Rosenthal pursuant to Section 6c of the Act.  See DE 1; 7 U.S.C. § 13a-

1(a) (allowing the Commission to bring an action against "any registered entity or other

person [that] has engaged . . . in any act or practice constituting a violation of any

provision of [the Act] or any rule, regulation, or order thereunder," so that the court may

"enjoin such act or practice" or "enforce compliance with" the law).  With regard to

Rosenthal, the Commission claimed, inter alia, that he had acted as a commodity

trading advisor ("CTA") without being registered, in violation of § 4m of the Act, and had

traded on a registered entity despite having failed to comply with the Commission

Order.  See DE 1 at 13-16; 7 U.S.C. § 6m(1); 7 U.S.C. § 18(f).[6]  The Commission and

Rosenthal reached a settlement of the claims against Rosenthal and agreed to the

entry of a Consent Order granting injunctive relief and monetary sanctions against him.

See DE 44.  On September 27, 2012, the Court approved the proposed Consent Order

and entered judgment against Rosenthal in accordance with the terms of that Order.

See DE 45.[7]

With respect to Angus Jackson and Bedick (together, "Defendants"), the

Complaint alleges that during the NFA's three audits of Angus Jackson, Defendants

willfully concealed material facts and made false statements or misrepresentations, in

violation of Section 9(a)(4) of the Act.  See DE 1 at 1-2, 12; 7 U.S.C. § 13(a)(4).  These

---

[6]  In general, the Act defines a "commodity trading advisor" as "any person who
. . . for compensation or profit, engages in the business of advising others . . . as to the
value of or the advisability of trading in" commodity futures and related investments.
7 U.S.C. § 1a(12)(A)(i); see 17 C.F.R. § 1.3(bb)(1).

[7]  The monetary sanctions against Rosenthal included $598,000 in disgorgement
and a civil penalty of $598,000, for a total of $1,196,000.  See DE 45 at 15-16.

alleged fraudulent acts concerned Angus Jackson's business relationship with Rosenthal, including the commission payments he received for trading client accounts. See DE 1 at 2, 12.  The Commission asserts that Angus Jackson is liable for these acts because Bedick committed them within the scope of his employment with the firm. See id. at 2, 11, 12; 7 U.S.C. § 2(a)(1)(B); 17 C.F.R. § 1.2.  Further, the Commission contends that Bedick is liable as a controlling person of Angus Jackson who "did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violation."  DE 1 at 2, 10-11, 13; see 7 U.S.C. § 13c(b).  The Complaint primarily seeks the following relief:  (1) a permanent injunction barring Defendants from violating Section 9(a)(4) of the Act and, essentially, from participating in commodity-futures trading; (2) an order requiring Defendants to disgorge all benefits received from violations of the Act and to pay prejudgment interest on those amounts; and (3) an order imposing civil penalties against Defendants for each of their violations.  See DE 1 at 16-19; 7 U.S.C. § 13a-1(b), (d)(1)(A), (d)(3)(B); 17 C.F.R. § 143.8(a)(4)(ii)(C), (D).

In their Answers, Defendants deny liability but admit some of the fraudulent acts claimed by the Commission.  See DE 10, 13.  In particular, Defendants admit that during the 2005 and 2008 NFA audits, Bedick made false statements to the NFA about Angus Jackson's business relationship with Rosenthal.  See DE 10 at 1-2, ¶ 1; id. at 8, ¶ 24; id. at 9, ¶ 28; DE 13 at 1-2, ¶ 1; id. at 11, ¶ 24; id. at 12-13, ¶ 28.  Defendants deny, however, that Bedick made any false statements in connection with the 2010 audit.  See DE 10 at 1-2, ¶ 1; DE 13 at 1-2, ¶ 1.  Defendants further assert that during the time they paid commissions to Rosenthal, he was operating under a registration exemption for any CTA "who, during the course of the preceding twelve months, has not furnished commodity trading advice to more than fifteen persons and who does not

hold himself out generally to the public as a [CTA]."  7 U.S.C. § 6m(1); see, e.g., DE 10 at 6, ¶ 19; DE 13 at 9, ¶ 19.

On October 11, 2012, the Commission filed its present Motion for Summary Judgment.  See DE 47.  Bedick has filed a Response to the Motion, and the Commission has filed a Reply.  See DE 51, 62.  The Commission and Bedick have also submitted appendixes containing various record materials.  See DE 47-2–47-5, 48, 53, 62-1–62-8.  The Motion is now ripe for decision.[8]

## II.     Discussion

### A.     Summary Judgment Standard

The Court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  To satisfy this burden, the movant must point out to the Court that "there is an absence of evidence to support the nonmoving party's case."  Id. at 325.

---

[8]  The Commission has moved to strike Bedick's Response, or for an order to show cause why discovery should not be reopened, based on evidence that Bedick's former counsel has continued to assist him in this case despite counsel's withdrawal. See DE 72, 73; supra note 1.  As set forth herein, the Court finds that even considering the arguments in Bedick's Response, the Commission is entitled to summary judgment on most (if not all) of its claims and requests for relief.  Thus, while the Court does not overlook the points raised in the Commission's motion to strike—including that counsel's apparent assistance of Bedick casts doubt on his claims of financial hardship—the Court will deny the motion as moot.  Still, if the improper conduct alleged by the Commission persists after the entry of this Order, the Commission may renew its request for appropriate relief against Bedick and his former counsel.

After the movant has met its burden under Rule 56(a), the burden of production shifts, and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). As Rule 56 explains, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3). Therefore, the non-moving party "may not rest upon the mere allegations or denials in its pleadings" but instead must present "specific facts showing that there is a genuine issue for trial." Walker v. Darby, 911 F.2d 1573, 1576-77 (11th Cir. 1990).

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker, 911 F.2d at 1577. If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).

The Court's function at the summary-judgment stage is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In making this determination, the Court must discern which issues are material: "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.

Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248. Moreover, in deciding a summary-judgment motion, the Court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  See Davis v. Williams, 451 F.3d 759, 763 (11th Cir. 2006).

### B.    Liability

#### 1.    2005 and 2008 Audits

Section 9(a)(4) of the Act makes it a felony for "[a]ny person willfully to falsify, conceal, or cover up by any trick, scheme, or artifice a material fact, make any false, fictitious, or fraudulent statements or representations, or make or use any false writing or document knowing the same to contain any false, fictitious, or fraudulent statement or entry to a . . . [registered] futures association . . . acting in furtherance of its official duties under [the Act]."  7 U.S.C. § 13(a)(4).  Here, Bedick admits that during the NFA's 2005 and 2008 audits of Angus Jackson, he made false statements about the company's business relationship with Rosenthal, in order to conceal that he was being paid commissions.  See supra Part I; DE 51 at 2 (Motion Response).  Specifically, Bedick misrepresented that Angus Jackson's payments to Jarma were for software development, trading systems, and related services.  To hide the truth from the NFA, Bedick directed Rosenthal to create fake invoices from Jarma, which Angus Jackson paid.  This scheme lasted for several years, until 2010, when Bedick finally admitted that the payments to Jarma were, in fact, commission payments to Rosenthal.  These undisputed facts show that, in connection with the 2005 and 2008 audits, Bedick engaged in unlawful, fraudulent conduct toward the NFA.  See 7 U.S.C. § 13(a)(4).

Bedick nonetheless argues that his misrepresentations to the NFA about Rosenthal's commission payments were not material because Rosenthal was exempt

from registration as a CTA—even though neither Rosenthal nor Bedick knew it at the time—and therefore "the payments to Rosenthal were proper."  DE 51 at 2; see id. at 5-6.  Bedick thus contends that, "in reality, [his] sole misstep was his misrepresentation to NFA during NFA's 2005 and 2008 audit[s]."  Id. at 2.  The Court rejects this argument.

As discussed below in Part II.C.2, the record refutes Bedick's claim that Rosenthal was exempt from registration and further shows that he was prohibited from trading on a registered entity.  But even if this were not the case, Bedick's misrepresentations during the 2005 and 2008 audits were material.  When the NFA asked Bedick about Angus Jackson's substantial payments to Jarma (an entity the NFA had no record of), Bedick lied about the nature of those payments, causing the NFA to forgo additional review of the transactions.  See, e.g., DE 47-2 at 108.  If Bedick had instead disclosed that the payments were for commissions to an unregistered CTA—even one who was later found to be exempt from registration—that information certainly would have prompted the NFA to investigate the matter further.

On a more basic level, Bedick's argument disregards that the NFA's inquiries about its members' financial conduct—such as Angus Jackson's payments to Jarma—are critical to the agency's regulatory function in ensuring proper business practices by its members, maintaining the integrity of the commodity-futures markets, and protecting the other participants in those markets.  Concealing the true nature of commission payments to CTAs, regardless of whether those payments are lawful, is a serious matter that impedes the NFA from performing its duties under the Act.  See DE 62 at 2 (Motion Reply) (explaining that Bedick's false statements were "necessarily material" because he "lied to the NFA about the very issues the NFA needs to understand to effectively function as a regulator").

For these reasons, no genuine dispute of material fact exists concerning Bedick's violations of Section 9(a)(4) of the Act during the first two NFA audits.  Bedick does not dispute that he committed these fraudulent acts within the scope of his employment with Angus Jackson.  See supra Part I; 7 U.S.C. § 2(a)(1)(B); 17 C.F.R. § 1.2.  Further, Bedick admits that he is a controlling person of Angus Jackson, and the record shows that he did not act in good faith and that he knowingly induced the violations.  See 7 U.S.C. § 13c(b).  Accordingly, both Defendants are liable for Bedick's false statements to the NFA during the 2005 and 2008 audits, and the Commission is entitled to summary judgment on Defendants' liability for that conduct.

### 2.   2010 Audit

As noted above in Part I, the parties give differing accounts of Bedick's statements to the NFA during its 2010 audit of Angus Jackson.  According to the NFA's interview summary, when Bedick was asked about payments to Rosenthal, he began to repeat his prior false statements but revealed the truth when pressed for more details:

> NFA represented that previous NFA examinations of AJF's cash activity did not note any payments to Rosenthal.  As such, NFA reiterated the question and asked again how Rosenthal was compensated.  Bedick clarified by stating that Rosenthal also provided trading systems.  Rosenthal owned an entity, Jarma Trading Inc. ("Jarma") which provided trading systems.  Bedick represented that Rosenthal's whole life was trading; he simply developed trading strategies and systems.  As such, AJF paid Jarma for creating trading systems.  NFA asked what types of trading systems were provided by Jarma, which Bedick responded to by stating that Jarma did not actually provide trading systems.  Bedick stated no previous or current customers traded any systems for Jarma Trading.  Further, Bedick claimed the payments to Jarma were actually commissions earned by Rosenthal from the Weisman and Winterman accounts.  Bedick added that Jarma did not offer or promote any trading systems to customers and the company was created to specifically pay commissions to Rosenthal.

17

DE 47-3 at 3.  In contrast to the Commission's version of events, Bedick denies making any false statements to the NFA during the 2010 audit and claims that he had previously disclosed the commission payments during the Weisman mediation proceeding.  See DE 52 at 5, ¶ 32; DE 47-2 at 49.

When the parties have had a full opportunity to be heard on an issue presented in a summary-judgment motion, the Court is authorized to "grant summary judgment for a **nonmovant**."  Fed. R. Civ. P. 56(f)(1) (emphasis added).  In this case, even if the Court were to accept the Commission's version of Bedick's statements during the 2010 audit, those statements—viewed as a whole—do not constitute a separate violation of Section 9(a)(4) of the Act.  While Bedick initially reiterated his prior false statements about Jarma providing trading systems, as soon as the NFA asked him about those services, he disclosed the full truth about Jarma and the payments to Rosenthal.  More, the preceding paragraph of the interview summary reflects that Bedick had already informed the NFA that Rosenthal was paid commissions on certain accounts:

> NFA asked Bedick how Rosenthal was compensated. Bedick represented that Rosenthal received 40% of all commissions, while the AJF received 60%. . . .  Bedick represented that Rosenthal only earned commissions on Weisman's and Winterman's accounts. . . .  NFA asked how[] Rosenthal was paid commissions.  Bedick responded that he simply wired funds to Rosenthal.

DE 47-3 at 2-3; see also DE 62-5 at 14-15 (deposition testimony by Bedick that at the outset of the audit interview, he admitted that he was "paying Mr. Rosenthal commission dollars").  And, during the same audit, Bedick confirmed the truth about the payments in his response to the NFA's e-mail questions.  See id. at 9-10.

Under the specific facts of this case, therefore, the Court concludes that Bedick's statements during the 2010 audit do not support a separate finding of liability against

Defendants.  Thus, the Court grants summary judgment to Defendants with respect to liability for those statements.[9]

## C.     Remedies

Having established that Defendants are liable for Bedick's false statements during the 2005 and 2008 NFA audits, the Court now turns to the appropriate remedies. As noted above in Part I.B, the Commission asks the Court to impose a permanent injunction, disgorgement, and civil penalties against Defendants.  The Court addresses each of these possible sanctions in turn.

### 1.     Permanent Injunction

Section 6c(b) of the Act allows a court, "[u]pon a proper showing," to grant a permanent injunction.  7 U.S.C. § 13a-1(b).  In deciding whether to grant a permanent injunction under this provision, "the ultimate test is whether the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future." Commodity Futures Trading Comm'n v. Wilshire Inv. Mgmt. Corp., 531 F.3d 1339, 1346 (11th Cir. 2008) (alteration & internal quotation marks omitted).  To determine whether this standard is met, courts should consider several factors:

> The egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.

Id. (alteration & internal quotation marks omitted).

---

[9]  Though arguing for a finding of liability as to all three audits, the Commission recognizes that Defendants' liability for the 2010 audit is more problematic:  "Because the misrepresentations made to the NFA during its 2005 and 2008 audits sufficiently establish that Bedick repeatedly violated Section 9(a)(4) of the Act, the question of whether Bedick also lied during the 2010 audit should not preclude summary judgment." DE 62 at 2 n.2.

Here, the Commission seeks a permanent injunction barring Defendants from violating Section 9(a)(4) of the Act and from participating in the trading of commodity futures (and related instruments) in any way.  <u>See</u> DE 1 at 16-18; DE 47 at 14-15.  After carefully reviewing the record concerning Defendants' past violations, the Court finds that the permanent injunction sought by the Commission is warranted.  In two separate audits by the NFA, Bedick deliberately misrepresented the nature of the payments to Jarma in an effort to conceal that Angus Jackson was paying commissions to Rosenthal, whom Bedick knew was an unregistered CTA.  Further, Bedick conspired with Rosenthal to create and pay fake invoices for services that Jarma never rendered.  This fraudulent conduct lasted several years and ended only because the payments to Rosenthal came up during the Weisman mediation and because Rosenthal reported them to the NFA.  These events led to the third audit—more than eight years after Defendants began paying Rosenthal commissions— in which Bedick finally revealed the truth to the NFA.

Also, Bedick's filings in this case reflect little remorse for his conduct.  He essentially contends that his false statements did not matter, claiming that Rosenthal was exempt from registration and therefore the commission payments were proper.  Aside from being based on a false premise (as discussed below), Bedick's argument ignores the seriousness of his repeated lies to regulators about Angus Jackson's payments to Rosenthal.  The Court recognizes that Angus Jackson has gone out of business, that the NFA has suspended both Defendants from NFA membership for seven years, and that Bedick is permanently barred from acting as a principal of an NFA member.  Still, the Court believes that allowing Bedick (and potentially Angus Jackson) to return eventually to the commodity-trading business in any capacity would create a significant risk of future violations.

In light of these factors, "defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future."  Wilshire Inv. Mgmt. Corp., 531 F.3d at 1346.  The Court therefore finds it appropriate to permanently enjoin Defendants from violating the Act and from engaging in any activities relating to commodity trading.  See, e.g., Wilshire Inv. Mgmt. Corp., 531 F.3d at 1347 & n.5 (affirming district court's entry of permanent injunction prohibiting defendants from engaging in commodity-related activities, and explaining that such injunctions are authorized in proper circumstances); U.S. Commodity Futures Trading Comm'n v. Gutterman, No. 12-21047-CIV, 2012 WL 2413082, at *8-*9 (S.D. Fla. June 26, 2012) (issuing permanent injunction nearly identical to that requested here).

### 2.      Disgorgement and Prejudgment Interest

Under Section 6c of the Act, "the Commission may seek, and the court may impose, on a proper showing, on any person found in the action to have committed any violation, equitable remedies including . . . disgorgement of gains received in connection with such violation."  7 U.S.C. § 13a-1(d)(3)(B).  "Disgorgement is an equitable remedy intended to prevent unjust enrichment."  SEC v. Lauer, 478 F. App'x 550, 557 (11th Cir. 2012) (per curiam) (citing Commodity Futures Trading Comm'n v. Sidoti, 178 F.3d 1132, 1138 (11th Cir. 1999)), cert. denied, 133 S. Ct. 545 (2012). The Commission "has the burden of proving the disgorgement figure reasonably approximates the amount of unjust enrichment."  Sidoti, 178 F.3d at 1138.  In this regard, "the district court may not disgorge profits obtained without the aid of any wrongdoing."  Id.  For the court to order disgorgement, the Commission must present "record evidence the defendant is liable (either directly or indirectly) for fraud."  Id.

In addition to ordering disgorgement, "the district court may also award prejudgment interest, and has wide discretion in making that calculation." Lauer, 478 F. App'x at 557.  Requiring payment of prejudgment interest prevents those who violate the Act and similar laws from "enjoying any benefit accrued from the use of the ill-gotten gain." SEC v. Huff, 758 F. Supp. 2d 1288, 1363 (S.D. Fla. 2010).  The Eleventh Circuit has explained that "awards of prejudgment interest are compensatory, not punitive, and that the district court should make its interest decision through 'an assessment of the equities.'" Lauer, 478 F. App'x at 557 (quoting Osterneck v. E.T. Barwick Indus., Inc., 825 F.2d 1521, 1536 (11th Cir. 1987)).  In general, however, a prejudgment interest award is justified by "proof of a defendant's scienter." Huff, 758 F. Supp. 2d at 1363.  Awards of prejudgment interest are commonly based on the IRS underpayment rate, as defined in 26 U.S.C. § 6621(a)(2).  See Lauer, 478 F. App'x at 558 & n.3.

In this action, the Commission seeks an order requiring Defendants to disgorge all benefits received from their violations of the Act and to pay prejudgment interest (as well as postjudgment interest) on those amounts.  See DE 1 at 18-19.  In particular, "the Commission requests that this Court order Bedick and Angus Jackson to disgorge a total of $955,000, jointly and severally." DE 47 at 16.  The Commission notes that this figure is the "total amount of commissions that [Defendants] inappropriately received from accounts traded by Rosenthal during the relevant period." Id.

Bedick makes three arguments in response to the Commission's request for disgorgement.  **First**, Bedick claims that "no customers were harmed by Bedick's misrepresentation" about the payments to Rosenthal.  DE 51 at 9.  The Court questions whether this is correct.  As discussed further below, Bedick's fraudulent conduct allowed Rosenthal to trade on behalf of several Angus Jackson customers, even

though he was not registered as a CTA and was prohibited from trading on registered entities due to his failure to comply with the Commission Order.  But even if no customers were directly harmed by Bedick's misrepresentations, his argument once again overlooks that this action is based on his repeated lies to regulators over the course of several years.  The commissions that Defendants earned from that illegal conduct are what Commission seeks to disgorge here.

**Second**, Bedick asserts that the commission payments to Rosenthal were proper because he "was operating as an exempt CTA."  Id.  Although Section 4m of the Act generally makes it unlawful for a CTA to operate without being registered, the statute exempts from the registration requirement "any [CTA] who, during the course of the preceding twelve months, has not furnished commodity trading advice to more than fifteen persons and who does not hold himself out generally to the public as a [CTA]." 7 U.S.C. § 6m(1); see 17 C.F.R. § 4.14(a)(10).  Bedick claims that Rosenthal was covered by this exemption and therefore "neither Bedick nor Angus Jackson received any benefits as a result of Mr. Bedick's misrepresentation in 2005 and 2008 to NFA." DE 51 at 10.[10]

In support of this argument, Bedick and Rosenthal have submitted declarations in response to Plaintiff's Motion.  See DE 53 at 6-10 (Bedick Decl.); id. at 22-24 (Rosenthal Decl.).  Bedick declares that he "was not aware" of Rosenthal giving trading advice to more than fifteen people in any twelve-month period or soliciting members of

---

[10]  Bedick was not aware of Rosenthal's alleged exemption while he was being paid commissions.  See DE 47-2 at 45; DE 62-5 at 27-28.  Rather, Bedick first learned of the exemption when he contacted an attorney after the settlement of the Weisman case in 2010.  See DE 53 at 42.  On this basis, Bedick testified that "I covered up something I did not need to cover up."  DE 62-5 at 27.

the public to trade through Angus Jackson.  Id. at 8, ¶¶ 10-11.  Bedick further states

that, "[t]o the best of my knowledge," Rosenthal did not advertise or market his services,

nor did he hold himself out to the public as a CTA.  Id., ¶ 12.  Similarly, Rosenthal

maintains that during the relevant time period, he never rendered trading advice to

more than fifteen people in a twelve-month period, solicited the public to trade through

Angus Jackson, or held himself out to the public as a CTA.  See id. at 23, ¶¶ 4-5.

Rosenthal also notes that for one of his clients, Weisman, he signed an agreement

confirming that he met the requirements for the registration exemption.  See id. at 23,

¶ 8; id. at 28.

        But these declarations—especially Rosenthal's—differ starkly from other

statements of record given by Bedick and Rosenthal.  In February 2011, Rosenthal sent

two e-mail messages to an NFA investigator regarding the Business Conduct

Committee's case against Defendants.  In those messages, Rosenthal emphasized that

he was **not** exempt from registration as a CTA.  See DE 62-2 at 2 (Decl. of Alex Kranz).

In the first message, Rosenthal stated that he had read the Act's exemption provisions

and that although "I am not an attorney . . . it seems to me that in no way did [I] qualify

for exemption as a CTA.  I never applied and Angus[,] Rose[,] or Bedick never asked

me to apply for exemption."  Id. at 4.  In the second message, Rosenthal explained that

he had regularly solicited members of the public for trading business and that Bedick

had assisted him in those efforts:

                I did have less th[a]n 15 persons or clients about 13 current
                with Angus in the last 12 months.  However I did hold myself
                out to the public in order to build my business and had a
                number of people lined up as prospects on an ongoing basis
                and held a number of meetings with prospective clients.

                Martin Bedick even joined me and prospective clients for
                dinner to help solicit[] additional clients.  I was asked by

24

some of my current clients if they could solicit[] additional
clients and receive a portion of my fee[]s, [I] agreed and
made Bedick and Rose aware of this.

Id. at 6.

Additionally, before the NFA Hearing Panel, Bedick and Rosenthal gave

testimony that conflicts with their present declarations about Rosenthal's alleged

exemption.  The Hearing Panel summarized this testimony as follows:

Bedick's testimony . . . did not support his claim that
Rosenthal (and Jarma) were exempt.  For example, Bedick
admitted during his testimony that he did not do any type of
due diligence to determine the number of accounts that
Rosenthal (and Jarma) may have been providing advice to,
and he had no idea the manner in which Rosenthal
represented or held himself (or Jarma) out to the owners of
the accounts he was managing at Angus Jackson.
Moreover, although Rosenthal never specifically addressed
the CTA exemption, Rosenthal's testimony included
information that suggests he didn't qualify for the exemption.
In particular, Rosenthal testified that he solicited individuals
who were taking his training courses to open managed
accounts at Angus Jackson, and some of those individuals
were people he did not know previously.

DE 47-4 at 22.  Based on this evidence, the Hearing Panel concluded that Defendants

had not shown that Rosenthal was exempt from registration.  See id. at 21, 23.  The

Appeals Committee specifically affirmed this ruling, agreeing with the Hearing Panel's

assessment of Bedick's and Rosenthal's testimony.  See DE 47-5 at 35-36.

Significantly, earlier in this action, Bedick admitted that his testimony before the Hearing

Panel was truthful.  See DE 47-2 at 69, ¶ 32 (Resp. to Pl.'s 1st Reqs. for Admissions).

These specific admissions by Rosenthal and Bedick refute the conclusory

statements in their present declarations that Rosenthal was exempt from registration.

Thus, the declarations—which make no effort to explain the prior admissions—do not

create a genuine dispute of material fact on this issue.  See Van T. Junkins & Assocs.,

Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."); see also Seshardi v. Kasraian, 130 F.3d 798, 804 (7th Cir. 1997) ("[W]e do not think that an affidavit should be allowed without explanation to controvert the affiant's written admissions, albeit made in documents rather than in a deposition—though documents that having been composed before the litigation would carry more conviction than a deposition, even though a deposition is given under oath." (emphasis omitted)).

Even if Bedick's and Rosenthal's declarations did create a triable issue of fact about whether Rosenthal was exempt from registration, Bedick's claim that Defendants' payments to Rosenthal were proper fails for a separate reason.  Throughout the relevant time period, Rosenthal was in violation of the 1988 Commission Order because he had failed to pay the reparation award.  See supra Part I.A.2.  When a party does not timely comply with a Commission reparation order, two penalties are imposed until the award has been paid:  (1) "such party shall be prohibited automatically from trading on all registered entities" and (2) "if the party is registered with the Commission, such registration shall be suspended automatically."  7 U.S.C. § 18(f); see 17 C.F.R. § 12.407(c), (d).

Setting aside Defendants' claim that Rosenthal was exempt from registration— which pertains to the second penalty under § 18(f)—there is no dispute that Rosenthal was "prohibited . . . from trading on all registered entities."  7 U.S.C. § 18(f).  Despite this prohibition, Rosenthal traded client accounts through Angus Jackson for several years.  See supra Part I.A.2.  Thus, Defendants' commission payments to Rosenthal

were improper, and Bedick's fraudulent concealment of those payments allowed Defendants to earn profits from Rosenthal's illegal trading.  See Sidoti, 178 F.3d at 1138.

**Third**, Bedick contends that even if an order of disgorgement were proper here, "the sanction has already been satisfied by Angus Jackson and Bedick's settlement with Marlene Weisman."  DE 51 at 10.  As discussed in Part I.A.3 above, in 2010, Angus Jackson and Bedick agreed to pay Weisman $315,000 to settle claims relating to trading losses that she had suffered in 2008.  Bedick claims that this figure "constituted the total amount of commissions Angus Jackson earned over the lifetime of [Weisman's] account."  DE 51 at 10; see DE 47-3 at 3, 5.  The Court finds this argument unavailing.

Assuming arguendo that Defendants settled with Weisman in an amount equal to the commissions earned on her accounts, Defendants are not entitled to deduct that amount from any disgorgement order in this case.  Weisman's claims against Defendants were based on her trading losses, which Bedick estimated at $1 million. See DE 47-2 at 50.  By contrast, the present action does not concern specific trades that Rosenthal made in client accounts, but rather, Defendants' fraudulent conduct in concealing their commission payments to Rosenthal.  It would not be equitable to give Defendants credit against their disgorgement obligation for a payment they made to compromise a client's separate claims of misconduct—even if that payment happened to equal the amount of commissions that Defendants earned from Weisman through their fraud in this case.  Cf. SEC v. Surgent, No. 04-60493-CIV, 2012 WL 4378033, at *1 (S.D. Fla. Sept. 25, 2012) ("The primary purpose of disgorgement is to deprive the wrongdoer of unjust enrichment, not to compensate investors.").

27

In sum, the record shows conclusively that Defendants were unjustly enriched by the commissions they received due to Bedick's fraud in concealing the payments to Rosenthal.  And the Commission has offered a reasonable approximation of this unjust enrichment, $955,000.  The Court thus concludes that Defendants should be required to disgorge this amount, jointly and severally.  Further, in view of Defendants' deliberate misconduct and the resulting unjust enrichment, the Court finds it appropriate to award prejudgment interest on the disgorgement amount, based on the IRS underpayment rate.  See 26 U.S.C. § 6621(a)(2).  This interest shall accrue from the dates that Defendants received the commissions from Rosenthal's trading, or a reasonable approximation thereof.  See DE 47-2 at 89 (spreadsheet reflecting commissions paid to Rosenthal).[11]

### 3.   Civil Penalties

Section 6c of the Act allows courts to impose civil monetary penalties against persons found to have violated the Act.  See 7 U.S.C. § 13a-1(d)(1)(A).  As relevant here, the maximum penalty that a court may impose for each violation is as follows: (1) for violations "[c]ommitted between October 23, 2004 and October 22, 2008, not more than the greater of $130,000 or triple the monetary gain to such person for each such violation"; and (2) for violations "[c]ommitted on or after October 23, 2008, not more than the greater of $140,000 or triple the monetary gain to such person for each such violation."  17 C.F.R. § 143.8(a)(4)(ii)(C), (D).

Civil penalties assessed under the Act need only be "rationally related to the offense charged or the need for deterrence."  Commodity Futures Trading Comm'n v.

---

[11]   The judgment in this case shall also include any postjudgment interest authorized by law.  See 28 U.S.C. § 1961.

Levy, 541 F.3d 1102, 1112 (11th Cir. 2008).  This "permissive standard" is consistent with the "broad discretion district courts typically exercise in calculating a civil monetary penalty."  Id.  Such penalties are not limited to the amount of profits derived from the violations.  See id. at 1112-13.  In assessing civil penalties, courts consider "the general seriousness of the violation as well as any particular mitigating or aggravating circumstances that exist."  Wilshire Inv. Mgmt. Corp., 531 F.3d at 1346.

The Commission's Complaint requests civil penalties against Defendants "in the amount of the higher of (1) triple the monetary gain to each Defendant for each violation of the Act or (2) $130,000 for each violation of the Act from October 23, 2004 through October 22, 2008, and $140,000 for each violation of the Act on or after October 23, 2008, plus post-judgment interest."  DE 1 at 19.  In its Motion, the Commission specifies that it is seeking "a civil monetary penalty equal to three times the monetary gain of $955,000, or $2,865,000, to be imposed jointly and severally against Bedick and Angus Jackson."  DE 47 at 18.

Having carefully considered the broad range of potential penalties, Defendants' fraudulent conduct in this case, and the need to deter such conduct, the Court imposes a civil penalty against Defendants of $1,910,000.  This penalty, for which Defendants shall be liable jointly and severally, is equal to twice Defendants' monetary gain from the concealment of Rosenthal's commission payments.  As the Court has already discussed, Defendants engaged in a fraudulent scheme, spanning several years, for the specific purpose of concealing the truth about the payments from the NFA.  This scheme included misrepresentations by Bedick during two separate NFA audits, as well as the creation and payment of phony invoices to conceal the nature of the payments.  This blatant and deliberate misconduct undermines the NFA's critical role in ensuring

proper business practices by those who participate in the commodity-futures markets and warrants a severe penalty to ensure adequate punishment and deterrence.

Nevertheless, while the Commission requests a penalty of three times Defendants' ill-gotten gains, the Court believes that a somewhat lesser penalty is appropriate.  The Court acknowledges that the number of violations by Defendants is not strictly tied to the number of audits during which Bedick made false statements. Indeed, the Commission has alleged in its Complaint that "[e]ach false, fictitious, or fraudulent statement, representation or omission made to the NFA during the audits of Angus Jackson, and each act of concealment, including but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of Section 9(a)(4) of the Act."  DE 1 at 13, ¶ 48; see Levy, 541 F.3d at 1111 ("It is undeniable that the complaint fairly informed Levy that he was being charged with each material misrepresentation and omission as a separate and distinct violation of the [Act] and its implementing regulations.").  The Court recognizes, however, that the Commission's claims are based not only on Bedick's statements to the NFA during the 2005 and 2008 audits but also on his statements during the 2010 audit.  As discussed above, the record does not support a separate finding of liability for Bedick's statements during the 2010 audit and instead shows that he admitted the full truth about the payments to Rosenthal.  See supra Part II.B.2.  While this admission was made reluctantly, it does mitigate to some degree the severity of the conduct alleged by the Commission.  The Court will therefore impose a civil penalty of double, rather than triple, Defendants' monetary gains from their fraudulent conduct.[12]

---

[12]  Bedick asks the Court to hold an evidentiary hearing on the appropriate sanctions against Defendants.  See DE 51 at 10. The Commission responds that such

### III.   Conclusion

Accordingly, as detailed above, it is hereby **ORDERED AND ADJUDGED** as follows:

1.    Plaintiff's Motion for Summary Judgment Against Defendants Angus Jackson, Inc., and Martin Harold Bedick [DE 47] is **GRANTED** with respect to liability arising from the NFA's 2005 and 2008 audits of Angus Jackson, but Plaintiff's Motion for Summary Judgment is **DENIED** as to liability for the 2010 audit;

2.    Summary judgment is **GRANTED** to Defendants Angus Jackson, Inc., and Martin Harold Bedick with respect to liability arising from the NFA's 2010 audit of Angus Jackson;

3.    The Court will impose sanctions against Defendants Angus Jackson, Inc., and Martin Harold Bedick as set forth herein;

4.    By **February 7, 2013,** Plaintiff shall submit a proposed judgment consistent with this Order;

5.    The calendar call scheduled for January 31, 2013, is **CANCELLED**, and the case is removed from the Court's February 4, 2013, trial calendar;

6.    Plaintiff's Motions in Limine [DE 65; DE 66], as well as Plaintiff's Motion to Strike Defendant Bedick's Response to Plaintiff's Motion for Summary Judgment, or in the Alternative, for Order to Show Cause Why Discovery Should Not Be Reopened, or for Other Equitable Relief [DE 72], are **DENIED as moot**; and

---

a hearing is unnecessary because the Court can determine sanctions based on the existing record, and Bedick has not indicated what evidence would be presented at a hearing.  See DE 62 at 9.  For the reasons stated by the Commission, the Court agrees that an evidentiary hearing is unnecessary and therefore denies Bedick's request.

7.      Following the Court's entry of judgment, the parties shall file and serve any

motions for attorney's fees or costs in accordance with Local Rule 7.3 and shall

confer as required by that Rule.

**DONE AND ORDERED** in Chambers in Fort Lauderdale, Broward County,

Florida, this 28th day of January, 2013.

JAMES I. COHN
United States District Judge

Copies furnished to:

Counsel of record

Martin Harold Bedick
3498 Pine Haven Circle
Boca Raton, FL  33431